## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| **ARTURO COLLAZO,** | ) | |
| | ) | |
| Debtor. | ) | **District Court** |
| | ) | **Case No. 19 C 5151** |
| | ) | |
| **ROBERT J. SIRAGUSA M.D. EMPLOYEE** | ) | |
| **TRUST (formerly known as Dermatology** | ) | |
| **Association of Bay County, PA, Defined** | ) | **Chapter 7 Bankruptcy** |
| **Benefit Plan), ROBERT J. SIRAGUSA,** | ) | **Case No. 12 B 44342** |
| **individually, DANA SIRAGUSA, and** | ) | |
| **ROBERT JOSEPH SIRAGUSA,** | ) | |
| | ) | **Adversary Proceeding** |
| | ) | **No. 13-216** |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | **Judge Jorge L. Alonso** |
| **ARTURO COLLAZO,** | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER ADOPTING BANKRUTPCY COURT'S FINDINGS OF FACTS AND CONCLUSIONS OF LAW

Plaintiffs, Robert J. Siragusa M.D. Employee Trust, Dr. Robert J. Siragusa, Dana Siragusa and Robert Joseph Siragusa, filed this adversary proceeding in the bankruptcy case of defendant-debtor Arturo Collazo, claiming that he had defrauded them. The bankruptcy court has submitted proposed findings of fact and conclusions of law to support the entry of a money judgment against Collazo on Dana and Robert Joseph's state-law fraud claims. For the reasons stated below, the Court adopts the proposed findings of fact and conclusions of law and enters judgment in favor of Dana and Robert Joseph and against Collazo.

## BACKGROUND

This case stems from numerous loans made by Dr. Robert Siragusa, his practice's pension plan, and his children to business entities owned in part by Arturo Collazo, the debtor in these bankruptcy proceedings. The Court sets forth certain relevant facts below.[1]

Collazo and a partner, Jon Goldman, were in the business of converting apartment buildings to condominiums and selling the converted units. They sometimes needed short-term financing to prevent construction delays while waiting for the principal construction lender to inspect the premises, which it insisted on doing before they could draw on the construction loan. In 2002 and 2003, Dr. Siragusa, his practice's pension plan, and his older daughter Dana provided numerous short-term loans to Collazo and Goldman's business entities, which issued promissory notes in exchange. The notes required the borrowing entities to make payments periodically from the net proceeds of the sale of the condo units, after the construction lender was repaid, with a final maturity date independent of the sales. As the Siragusas later learned, however, in late 2003, Collazo and Goldman began transferring the condo units from the borrowing entities to other business entities with clean balance sheets so that they could take out new loans, using the transferred condo units as collateral. This practice of stripping the borrowing entities of assets made the notes essentially uncollectible because the issuing entities were judgment-proof.

In 2004, Collazo and Goldman made a number of payments to the Siragusas, but these payments were late and some were partial, and much of the debt that the Siragusas held remained unpaid. In the summer of 2005, a Collazo/Goldman entity that had issued notes to Dana and Dr.

---

[1] The background facts of this case are described more fully in the bankruptcy court's March 5, 2014 Memorandum of Decision, *In re Collazo*, Bankruptcy No. 12 B 44342, Adversary No. 13 A 216, 2014 WL 866075, at *1 (Bankr. N.D. Ill. Mar. 5, 2014), *aff'd sub nom. Robert J. Siragusa M.D. Employee Tr. v. Collazo*, 549 B.R. 693 (N.D. Ill. 2015) (Alonso, J.), *aff'd in part, rev'd in part sub nom. In re Collazo*, 817 F.3d 1047 (7th Cir. 2016).

Siragusa transferred three more condo units in a building at 1300 Eddy Street to another Collazo/Goldman business entity, which granted a mortgage on them to a new lender. Upon completion of these transfers, all of the unsold units in the buildings in which the Siragusas had invested had been transferred to business entities that owed no legal obligations to the Siragusas.

In the fall of 2005, Collazo sought new loans from the Siragusas to finance a development in Arizona. He assured Dr. Siragusa that all outstanding loans would be repaid after the remaining condo units sold, which he said he expected to happen in the next thirty to sixty days, but he did not reveal that these units had been transferred out of the business entities that had issued the notes, that these units were encumbered by new mortgages, or that units in certain of the projects the Siragusas had invested in (including the Eddy Street building) had already been sold, without any of the proceeds having been applied toward payment of the Siragusas' notes. On November 22, 2005, CG Development LLC, one of Collazo and Goldman's business entities, issued an $800,000 note to Dr. Siragusa's pension plan and a $200,000 note to three of his children—Dana, his son Robert Joseph, and his younger daughter Julie—in exchange for investments in those amounts. Both notes promised an annual rate of 20% interest, and 25% after default.

In July 2007, Julie, who worked with Collazo as a real estate agent, called Dr. Siragusa to celebrate selling the last unit in the Eddy Street building. Irritated that he had not received any payments based on proceeds from the sale of the other Eddy units or even known they were sold, Dr. Siragusa told Julie that he had invested in the building and needed to know when its units sold.

The Arizona notes matured in November 2007, but no payments were made. The Arizona development failed following the collapse of the real estate market there in 2008, and Collazo's construction lender ultimately accepted a deed in lieu of foreclosure. Dana, a practicing attorney, began to negotiate a settlement with Collazo, and he made a settlement proposal in January 2009.

Dana was alarmed to discover that the proposal referred to units in buildings the Siragusas had not invested in. She looked into the matter more deeply and learned that the entities that had issued the notes to the Siragusas had transferred all of their units to other entities, which had sold them.

Before the parties could reach any settlement agreement, Collazo filed a Chapter 7 bankruptcy petition in 2012, and the Siragusas filed proofs of claim for fraud and contractual debts under the promissory notes. The Siragusas then filed this adversary proceeding, asserting that their claims were non-dischargeable under 11 U.S.C. § 523(a)(2)(A) because they were based on debts for money obtained by false pretenses, false representation or fraud. The bankruptcy trustee filed a report of no distribution, and the bankruptcy case was closed on December 20, 2013, although the bankruptcy court had not yet issued a ruling in the Siragusas' adversary proceeding.

## PROCEDURAL HISTORY

The bankruptcy court held a trial in this adversary proceeding in October 2013, and it rendered its decision in a written opinion on March 5, 2014. The court determined that the claims based on notes issued prior to 2004 were dischargeable because there was no evidence that Collazo had any fraudulent intent at that time. The claims stemming from the 2005 Arizona notes were non-dischargeable because Collazo knew that, contrary to what he had told Dr. Siragusa, the outstanding loans to the Siragusas would not be repaid within sixty days, given the priority of the vast mortgage debt Collazo's business entities had incurred. The court found that Dr. Siragusa and Julie's claims were time-barred based on their July 2007 conversation, in which each of them learned facts from the other that should have put them on notice of something fishy. As for Dana and Robert Joseph, the court found that their fraud claims were viable because the applicable five-year statute of limitations period, *see* 735 ILCS 5/13-205, did not begin running until 2009, when Dana received the settlement proposal from Collazo and learned that the units had all been transferred and sold.

The bankruptcy court did not enter a money judgment, uncertain whether it had the constitutional or statutory authority to do so. In particular, the bankruptcy court explained, it doubted its constitutional authority under *Stern v. Marshall*, 564 U.S. 462 (2011), which had held that a bankruptcy judge lacked authority under Article III of the United States Constitution to enter final judgment on the debtor's state law counterclaim against a creditor, and which some courts had interpreted to bar bankruptcy courts from "resolv[ing] a creditor's state-law claim when the court decides whether that claim is nondischargeable." *See Lee v. Christenson*, 558 F. App'x 674, 676 (7th Cir. 2014). Additionally, it doubted its statutory authority under 28 U.S.C. § 1334, which gives federal courts jurisdiction to adjudicate claims "related to" a bankruptcy case. "Because," the court reasoned, "the entry of monetary judgment against a post-discharge debtor has no effect on distribution of the bankruptcy estate, it is not related to" the bankruptcy case. *See Collazo*, 549 B.R. at 700 (quoting Order Denying Motions to Amend Order, Bankruptcy No. 12 B 44342, Adversary Proceeding 13 A 000216, ECF No. 105 (Bankr. N.D. Ill. May 14, 2014) (citing *In re Xonics, Inc.*, 813 F.2d 127, 131 (7th Cir. 1987))).

The Siragusas appealed to this Court pursuant to 28 U.S.C. § 158(a)(1), arguing that the bankruptcy court had erred and, in the alternative, this Court should enter the money judgment itself. Unlike the bankruptcy court, this Court *is* empowered under Article III to decide cases governed by state law, and, the Siragusas argued, it can exercise supplemental jurisdiction over their fraud claims under 28 U.S.C. § 1367, even if those claims are not "related to" the bankruptcy in the sense that they might have an effect on distribution of the bankruptcy estate, given that Collazo's bankruptcy case is closed and there is nothing left to distribute.

This Court declined to enter a money judgment, instead deciding to relinquish jurisdiction because, with the bankruptcy case closed, the remaining federal interest was remote. Further, this

Court reasoned, the present record was not sufficiently well-developed to liquidate the fraud claim, and if further proceedings were necessary even in federal court, then any interest in "judicial economy" served by retaining the case was slight and did not "outweigh the interest in leaving questions of state law to the state courts." *Collazo*, 549 B.R. at 703.

The Siragusas appealed again, and the Seventh Circuit affirmed, except as to Dana's claim that Collazo's transfer of condo units from the borrower entities to judgment-proof entities was itself fraudulent, irrespective of whether it was accompanied by any fraudulent misrepresentation. *See Collazo*, 871 F.3d at 1053 (citing *McClellan v. Cantrell*, 217 F.3d 890, 894-95 (7th Cir. 2000)); *see also Husky Int'l Elecs., Inc. v. Ritz*, 136 S. Ct. 1581, 1589 (2016) (citing *McClellan* with approval). The Seventh Circuit remanded for consideration of whether Collazo made these transfers with the intent to frustrate creditors. With respect to liquidating Dana and Robert Joseph's Arizona fraud claims, the Seventh Circuit added that while the bankruptcy court was free to do as it had done originally, namely, "declin[ing] to award damages and instead remitt[ing] the creditors (Dana and Robert Joseph) to their state-court remedies," *Collazo*, 871 F.3d at 1053 (citing *In re Sasson*, 424 F.3d 864, 874 (9th Cir. 2005)), on remand it "should consider . . . two other alternatives, because the entry of a monetary judgment is 'related to [a] case[] under'" the bankruptcy code, *Collazo*, 871 F.3d at 1053 (citing 28 U.S.C. § 1334(b)). The first alternative was to determine whether the parties would consent to the bankruptcy court's jurisdiction. *Collazo*, 871 F.3d at 1053-54 (citing *Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932, 1939 (2015)). The other was "to submit proposed findings of fact and conclusions of law to the district judge to accept or reject." *Collazo*, 871 F.3d at 1054 (citing *Executive Benefits Ins. Agency v. Arkison*, 573 U.S. 25, 28 (2014)).

On remand, the bankruptcy court set the case for a trial on Dana's fraudulent transfer claim, but the parties reached a settlement on that claim on the eve of trial, leaving the court once again in the position of having only to determine whether to liquidate the judgment on Dana and Robert Joseph's Arizona fraud claim. Collazo withheld consent to entry of a final judgment by the bankruptcy court, so the bankruptcy court opted to prepare proposed findings of fact and conclusions of law for this Court to approve.

The bankruptcy court received unrebutted declarations establishing that, of the $200,000 lent in their name, Dana contributed $50,000, while Robert Joseph contributed $150,000. Their sister Julie was also one of the named noteholders, but she had not contributed any funds to the loan. The court concluded that, under Illinois law, Dana and Robert Joseph were entitled to a return of the money they had lent, plus prejudgment interest of 5% per year under 815 ILCS 205/2. Additionally, the bankruptcy court concluded that Dana and Robert Joseph were entitled to punitive damages because Collazo's fraudulent misrepresentation about repayment of the outstanding notes was not isolated but "'wantonly and designedly made,'" given that it was made with full knowledge that the loans not be repaid from the proceeds of forthcoming unit sales or otherwise because he had encumbered the units with vast mortgage debt and he had made the borrowing business entities judgment-proof. (Proposed Findings of Facts and Conclusions of Law at 10, Bankruptcy No. 12 B 44342, Adversary Proceeding 13 A 000216, ECF No. 249 (Bankr. N.D. Ill. Jul. 1, 2019) (quoting *Home Sav. and Loan Ass'n v. Schneider*, 483 N.E.2d 1225, 1228 (Ill. 1985).) Noting that the Siragusas had expended some $250,000 in attorney's fees in the Collazo litigation, the bankruptcy court proposed awarding punitive damages of $100,000, half of the amount Dana and Robert Joseph had been defrauded of. Thus, the bankruptcy court recommended entering judgment as follows:

> [J]udgment should be entered against Arturo Collazo and in favor of Robert Joseph in an amount equal to $150,000 plus 5% *per annum* simple interest . . . which should run from November of 2005 to the time that judgment is entered, with punitive damages of $75,000 added to that total amount. Judgment should also be entered against Arturo Collazo and in favor of Dana Siragusa in an amount equal to $50,000 plus 5% *per annum* simple interest . . . which should run from November of 2005 to the time that judgment is entered, with punitive damages of $25,000 added to that total amount.

(Proposed Findings of Facts and Conclusions of Law at 13.) Both parties have filed objections to the bankruptcy court's proposal. This Court now reviews the proposed findings and conclusions *de novo*. *Arkison*, 573 U.S. at 28.

<b><u>ANALYSIS</u></b>

> "A bankruptcy judge may hear a proceeding that is not a core proceeding but that is otherwise related to" a bankruptcy case. 28 U.S.C. § 157(c)(1). In such a proceeding, the bankruptcy judge will issue proposed findings of fact and conclusions of law to the district court for its review. *Id.* The district court shall then review de novo "any portion of the findings of fact or conclusions of law to which specific written objection has been made." *Brandt v. Charter Airlines, LLC*, No. 14 C 5102, 2015 WL 4764145, at *3 (N.D. Ill. Aug. 12, 2015) (citing Fed. R. Bank. P. 9033(d); *Arkison*, 573 U.S. at 35-36).

*In re: Tolomeo*, No. 15 C 8118, 2015 WL 8741730, at *3 (N.D. Ill. Dec. 15, 2015). "The Court may accept, reject, or modify the proposed findings of fact or conclusions of law, receive further evidence, or recommit the matter to the bankruptcy judge with instructions." *Brandt*, 2015 WL 4764145, at *3.

## I. COLLAZO'S OBJECTIONS

### A. "Related to" Jurisdiction and Abstention

11 U.S.C. § 1334(b) gives district courts (and by reference, bankruptcy courts) jurisdiction over "all civil proceedings arising under title 11 [*i.e.*, the bankruptcy code], or arising in or related to cases under title 11." A district court has jurisdiction over core bankruptcy proceedings, such as this adversary proceeding to determine non-dischargeability under 11 U.S.C. § 523(a), because it "arises under" title 11. *See* 28 U.S.C. § 157(b) (listing "determinations as to . . . dischargeability"

as a "core" proceedings that arise under title 11 or arise in a case under title 11).  It also has jurisdiction over state-law claims, such as Dana and Robert Joseph's state-law fraud claim, to the extent that they are "related to" an underlying bankruptcy case.  *See Arkison*, 573 U.S. at 37-38.

Collazo argues that this Court lacks jurisdiction or, alternatively, should abstain from exercising it, because his bankruptcy case is otherwise concluded, so at this point there is nothing for the Siragusas' fraud case to be related to.  The bankruptcy court was previously sympathetic to this argument (*see* Order Denying Motions to Amend Order, Adversary Proceeding No. 13-216, ECF No. 105 at 2), and this Court followed its lead on appeal, *Collazo*, 549 B.R. at 700, 702-03.  But the Seventh Circuit seemed less sympathetic to the argument, stating simply in its opinion in this case that "the entry of a monetary judgment after a finding of nondischargeability is 'related to [a] case[ ] under title 11.'"  *Collazo*, 817 F.3d at 1053 (quoting 28 U.S.C. § 1334(b)).  Its reasoning in this regard was not clear,[2] but the court cited *In re Sasson*, which concluded that a court exercising bankruptcy jurisdiction has the "authority to enter a money judgment in conjunction with [a] nondischargeability order," 424 F.3d 864, 874 (9th Cir. 2005), citing several bases for such authority, including "related to" jurisdiction, *id.* at 868-69.

On remand, the bankruptcy court thought that the Seventh Circuit's statement, though unelaborated, was reason enough to reject Collazo's position.  This Court agrees.  The Seventh Circuit stated in an opinion in this very case that the "related to" jurisdiction permits the entry of a money judgment against Collazo, and this Court needs no other authority.

But even if that weren't enough, in *Bush v. United States*, 838 F.3d 839, 845-46 (7th Cir. 2019), a decision issued after Collazo filed his objections in this case, the Seventh Circuit cut still

---

[2] In fact, in *Bush v. United States*, 838 F.3d 839, 844-45 (7th Cir. 2019), the Seventh Circuit distanced itself from this language as "unreasoned" to the extent it might suggest that "entry of a money judgment following the conclusion of a bankruptcy always is 'related to' that bankruptcy for the purpose of § 1334(b)."

more of the ground out from under his argument, to the extent the argument is based on the fact that Collazo's bankruptcy proceedings are otherwise concluded.

Prior to *Bush*, Collazo's argument appeared to be grounded in sound authority. While most circuits have adopted the Third Circuit's version of the test for "related to" jurisdiction, which is "'usual[ly] articulat[ed]'" as "'whether the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy,'" *see Celotex Corp. v. Edwards*, 514 U.S. 300, 308 n.6 (1995) (quoting *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984) (emphasis omitted)), the Seventh Circuit "seem[ed] to have adopted a slightly different test," *Celotex*, 514 U.S. at 308 n.6, a "more limited" one that turned on whether the dispute "'affects the amount of property for distribution,'" *i.e.*, the debtor's estate, "'or the allocation of property among creditors.'" *In re FedPak Sys., Inc.*, 80 F.3d 207, 213-14 (7th Cir. 1996) (quoting *Xonics*, 813 F.2d at 131). Of course, if the debtor's bankruptcy case is already closed, no potential outcome in an adversary proceeding can affect the amount of property for distribution or the allocation of property among creditors. *See Xonics*, 813 F.2d at 131.

But in *Bush*, the Seventh Circuit "align[ed] . . . with the view widely held by" the other circuits and held that, consistent with the "fundamental rule[] of federal jurisdiction . . . that judicial authority depends on the state of affairs when a case begins (equivalently, when a claim is filed in bankruptcy) rather than on how things turn out[,] . . . ***the related-to jurisdiction must be assessed at the outset of the dispute***, and it is satisfied when the resolution has a potential effect on other creditors." 939 F.3d at 845-46 (emphasis added). There is little doubt that, from an "*ex ante* perspective," *id.* at 846, the resolution of the Siragusas' dispute—their claims that Collazo defrauded them, entitling them to damages—had the potential to affect the size of Collazo's bankruptcy estate. Thus, this Court has "related to" jurisdiction over the Siragusas' fraud claim.

As for whether the Court should abstain, this is another position for which this Court previously had sympathy, but the circumstances have changed.  On appeal, the Seventh Circuit directed the bankruptcy court to consider submitting proposed findings of fact and conclusions of law to this Court on remand, and it has now done so.  To the extent that this Court agrees with the proposal (and as it will explain in more detail below, it does), there is nothing left to do but enter the judgment.  This Court previously found that, because there was still more to do, this case was not one that had "'proceeded through one court system and [was] almost finished with there.'"  *See Collazo*, 549 B.R. at 702-03 (quoting *Chapman v. Currie Motors, Inc.*, 65 F.3d 78, 81 (7th Cir. 1995)).  But now it is precisely that case, and in such cases the "interest in judicial economy argues powerfully for keeping the case . . . to the end."  *Chapman*, 65 F.3d at 81; *cf. Bush*, 939 F.3d at 846-47 (bankruptcy judge's "exercise of authority [over tax dispute was] no longer appropriate" after bankruptcy case ended where tax dispute still had to be set for trial).  The balance of interests has shifted, and it now favors retaining jurisdiction to conclude this long-running dispute, rather than relinquishing it to the state courts.

Collazo argues that this Court should relinquish jurisdiction not only because the bankruptcy case is concluded but also because resolving the fraud claims in this proceeding would deprive him of his right to a jury trial.  The Siragusas argue that Collazo has waived any right to a jury trial that he may have had, and the Court agrees.  The Seventh Circuit has held that "[t]he Seventh Amendment confers no right to a jury trial on a debtor . . . who files voluntarily for bankruptcy and is a defendant in an adversary proceeding.  Even if [the debtor] was pursuing a 'legal' claim, by submitting it to the bankruptcy forum he lost any Seventh Amendment jury trial right he might have asserted."  *Matter of Hallahan*, 936 F.2d 1496, 1506 (7th Cir. 1991); *see id.* at 1505-06 (describing the "injustice that would result" from granting voluntary bankruptcy

petitioners a right to a jury trial in adversary proceedings, given that they have taken advantage of other rights in bankruptcy, including the automatic stay). Collazo had no right to a jury trial in this adversary proceeding, nor does the fact that he would have had one in state court convince the Court to relinquish jurisdiction; Collazo is here because he voluntarily filed a bankruptcy petition.

This Court has jurisdiction under 28 U.S.C. § 1334(b) because this case is "related to" Collazo's bankruptcy, despite the fact that his bankruptcy case is closed, and the powerful interest in judicial economy weighs decisively against relinquishing jurisdiction over the remaining state-law issues.

### B. Double Recovery

In an affidavit submitted in this case, Dr. Siragusa swore that, in 2011, when the Arizona notes were more than three years past due and it appeared they would never be repaid, Dr. Siragusa gave Robert Joseph a gift of $150,000 and Dana a gift of $50,000 to make up for what they had lost. (Nov. 27, 2017 Decl. of Dr. Robert Siragusa ¶¶ 5-7, Adversary Proceeding No. 13-216, ECF No. 192-1.) Dr. Siragusa explained that he made the gifts because he "felt awful" about Dana and Robert Joseph's losses, since he had been the one to introduce them to Collazo. (*Id.*)

Collazo argues that, having received these payments from their father, Dana and Robert Joseph have not actually lost anything, so they are not entitled to money damages, which would only afford them a windfall. Alternatively, he argues, to the extent that Dana and Robert Joseph assigned their claims to Dr. Siragusa, the Court cannot enter a money judgment in his favor because any claims of Dr. Siragusa are time-barred.

But, as the Siragusas argue in response, Collazo cites no authority to support his argument, (nor is the Court aware of any), and failing to develop an argument or cite authority to support it is grounds for forfeiture. *Gondeck v. A Clear Title & Escrow Exch., LLC*, No. 11 C 6341, 2013 WL 4564994, at *3 (N.D. Ill. Aug. 28, 2013); *see Pelfresne v. Vill. of Williams Bay*, 917 F.2d

1017, 1023 (7th Cir. 1990) ("A litigant who fails to press a point by supporting it with pertinent authority, or by showing why it is sound despite a lack of supporting authority or in the face of contrary authority, forfeits the point. [The Court] will not do his research for him.") (internal citation omitted). Further, forfeiture aside, Collazo does not dispute the facts set forth in Dr. Siragusa's affidavit, and the Court fails to see why Dana and Robert Joseph should forfeit their fraud claims because their father made them a gift in an act of pure goodwill to assuage his own guilt. Collazo points to no evidence that Dr. Siragusa made these payments to Dana and Robert Joseph with the intent to litigate their fraud claims himself, nor does he say anything of the sort in his affidavit, so the Court fails to see why it should consider him to have "purchased" them, as Collazo argues. Dr. Siragusa's gifts to Robert Joseph and Dana do not prevent them from recovering money damages from Collazo.

### C. Julie's Interest

Collazo argues that the bankruptcy court erred in proposing that Robert Joseph and Dana are entitled to recover the amounts they contributed to the $200,000 Arizona loan; instead, the argument goes, Julie should be treated as having a one-third interest in the note, and Dana and Robert's recoveries should be reduced accordingly. According to Collazo, from the beginning the Siragusas have asserted their claim "on the basis that Julie, Robert Joseph, and Dana were co-owners of the note" (Def.'s Bankruptcy Rule 9033 Objections at 7, Bankruptcy No. 12 B 44342, Adversary Proceeding 13 A 000216, ECF No. 253 (Bankr. N.D. Ill. Jul. 25, 2019)), and, Collazo argues, they are judicially estopped from changing that position now.

There is no rigid formula for determining whether the equitable doctrine of judicial estoppel applies, but courts weigh several factors including "(1) whether the party's later position was 'clearly inconsistent' with its earlier position; (2) whether the party against whom estoppel is asserted in a later proceeding has succeeded in persuading the court in the earlier proceeding; and

(3) whether the party 'seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.'" *In re Airadigm Commc'ns, Inc.*, 616 F.3d 642, 661 (7th Cir. 2010) (quoting *New Hampshire v. Maine*, 532 U.S. 732, 750-51 (2001)); *see State Farm Fire & Cas. Co. v. Watts Regulator Co.*, 63 N.E.3d 304, 309 (Ill. App. Ct. 2016) ("The party to be estopped must: (1) have taken two positions (2) that are factually inconsistent (3) in separate judicial or quasi-judicial proceedings, (4) with the intent that the trier of fact accept the facts alleged as true, and (5) have succeeded in the first proceeding and received some benefit from it.").

The Siragusas have not gained any advantage, unfair or otherwise, by making clearly inconsistent statements, so the balance of equities does not favor applying the doctrine of judicial estoppel against them. Collazo has not pointed to any place in the record where the Siragusas made clearly factually inconsistent statements about whether Julie contributed some portion of the $200,000 lent to CG Development, LLC. The best he can do is to point to their proof of claim in Collazo's bankruptcy, in which they asserted that Julie was one of the noteholders entitled to repayment of the $200,000 loan, and the complaint in this adversary proceeding, in which Julie asserted a fraud claim based on Collazo's failure to repay the $200,000 Arizona note. But merely stating that she was named in the note as one of the holders—which is undisputed—and asserting her rights as such is not clearly inconsistent with the position that she did not actually contribute any portion of the sum CG Development, LLC borrowed. *See In re Knight-Celotex, LLC*, 695 F.3d 714, 723 (7th Cir. 2012) (no clear inconsistency in action that was "at most a harmless violation of . . . disclosure obligations"); *Stanfield v. Dart*, No. 10 C 6569, 2014 WL 996482, at *12 (N.D. Ill. Mar. 13, 2014) (no clear inconsistency when there was "no evidence that an official position was ever taken" in earlier proceedings). This is particularly true considering the

difference in procedural posture between the earlier statements in the proof of claim and complaint and the statements the Siragusas make now, at the damages stage of this adversary proceeding. *Buchanan Energy (N), LLC v. Lake Bluff Holdings, LLC*, No. 15 CV 3851, 2017 WL 4921959, at *4 (N.D. Ill. Oct. 31, 2017) (rejecting argument that difference in party's position at summary judgment stage supported application of judicial estoppel, noting that "[o]ther courts have adopted similar reasoning in declining to apply judicial estoppel where the party's prior position was taken at the motion to dismiss stage.").

Further, and critically, the Court fails to see when or in what sense the Siragusas previously "succeeded" in persuading the court that Julie contributed some portion of the loan or where they received some benefit from doing so. Till now, neither the bankruptcy court nor this Court has had any occasion to make any findings on whether Julie contributed any portion of the loan. Without any prior inconsistent findings or conclusions, there is no unfairness in the Siragusas' present position, and there is no basis for applying judicial estoppel against them. *See Peterson v. McGladrey & Pullen, LLP*, 676 F.3d 594, 597 (7th Cir. 2012); *Knight-Celotex*, 695 F.3d at 723-24; *Buchanan*, 2017 WL 4921959, at *4.

### D. Punitive Damages

Collazo argues that this Court should reject the award of punitive damages that the bankruptcy court has proposed because punitive damages are unwarranted in this case and, even if warranted, an award of $100,000 in punitive damages is excessive.

#### 1. Whether punitive damages are warranted

"Punitive damages may be awarded when the defendant's tortious conduct evinces a high degree of moral culpability, that is, when the tort is 'committed with fraud, actual malice, deliberate violence or oppression, or when the defendant acts willfully, or with such gross negligence as to indicate a wanton disregard of the rights of others.'" *Slovinski v. Elliot*, 927

N.E.2d 1221, 1225 (Ill. 2010) (quoting *Kelsay v. Motorola, Inc.,* 384 N.E.2d 353, 359 (Ill. 1978)). In cases of fraud, the plaintiff must establish "'not only simple fraud but gross fraud, breach of trust, or other extraordinary or exceptional circumstances clearly showing malice or willfulness.'" *Roboserve, Inc. v. Kato Kagaku Co., Ltd.*, 78 F.3d 266, 275-76 (7th Cir. 1996) (quoting *AMPAT/Midwest, Inc. v. Ill. Tool Works, Inc.*, 896 F.2d 1035, 1043 (7th Cir. 1990)). "'[D]eceit alone cannot support a punitive damage award,' but such an award is appropriate 'where the false representations are wantonly and designedly made.'" *Jannotta v. Subway Sandwich Shops, Inc.*, 125 F.3d 503, 511 (7th Cir. 1997) (quoting *Schneider*, 483 N.E.2d at 1228).

"To justify punitive damages, the allegedly outrageous conduct must 'involv[e] some element of outrage similar to that usually found in a crime.'" *Roboserve*, 78 F.3d at 276 (quoting Restatement (Second) of Torts § 908, cmt. b (1979)); *see Loitz v. Remington Arms Co.*, 563 N.E.2d 397, 402 (Ill. 1990) (quoting same language of Restatement). A plaintiff demonstrates the requisite "malice, wantonness or grossness" by "put[ting] forth some evidence of intent to injure" or "an utter indifference to or conscious disregard" for others. *Roboserve*, 78 F.3d at 276 (internal quotation marks omitted); *see Burke v. 12 Rothschild's Liquor Mart, Inc.*, 593 N.E.2d 522, 530-31 (Ill. 1992) (describing in similar terms "the quasi-intentional nature of willful and wanton conduct" warranting punitive damages). In other words, "[o]ne way to satisfy [the] standard is through evidence indicating that a fraud was designed to enrich the defendant without regard to its effect on others or was intended by him to harm the plaintiff." *Jannotta*, 125 F.3d at 511.

Collazo argues that the bankruptcy court's proposed punitive damages do not comport with the facts of this case or the findings rendered in the bankruptcy court's 2014 opinion following the trial. According to Collazo, the bankruptcy court recognized in 2014 that Collazo had had no fraudulent intent during the time frame in which the Siragusas made most of their investments in

his companies; the bankruptcy court credited the evidence that, at least at the outset, Collazo's practice of transferring condo units to new business entities was merely a way to secure additional financing, and it was only the 2005 Arizona notes that were based on fraudulent misrepresentations. Those earlier findings, Collazo argues, show that he committed no more than "simple fraud" in 2005 and are inconsistent with the bankruptcy court's proposed finding on remand that Collazo's fraudulent misrepresentation in 2005 was part of an elaborate scheme that warrants punitive damages.

Collazo's argument does not accurately characterize the bankruptcy court's proposal, and his logic does not hold. The bankruptcy court did not use the word "scheme" in its proposed findings of fact and conclusions of law, and whether Collazo's practice of transferring and re-mortgaging units was fraudulent from the beginning is immaterial. As the bankruptcy court explained, Collazo's 2005 misrepresentation that the outstanding notes would be repaid upon the sale of the remaining units in thirty to sixty days was made with the requisite degree of culpability if it was "wantonly and designedly made," *Schneider*, 483 N.E.2d at 1228, or if it "was designed to enrich [Collazo] without regard to its effect on others," *Janotta*, 125 F.3d at 511. Put differently, punitive damages are appropriate if Collazo induced the Siragusas to invest in his Arizona project in 2005 by making a fraudulent representation that "deliberately inflict[ed] a highly unreasonable risk of harm upon [the Siragusas] in conscious disregard of it," *see Loitz*, 563 N.E.2d at 402 (quoting *Bresland v. Ideal Roller & Graphics Co.*, 501 N.E.2d 830, 839 (Ill. App. Ct. 1986) (citing Restatement (Second) of Torts § 886A, cmt. k (1979) (internal quotation marks omitted))).

In its 2014 decision, the bankruptcy court explained that the Siragusas had a cognizable fraud claim arising out of the Arizona notes because Collazo had induced them to lend by stating that he would shortly repay the outstanding loans with the proceeds from imminent condo unit

sales, although he "had already transferred the unsold units to non-borrower entities and had also granted first and second mortgages on the units in order to secure new debts," which "essentially made repayment impossible." *Collazo*, 2014 WL 866075, at *10. "In addition, 1300 Eddy LLC," one of Collazo's borrower entities, "sold a unit in May 2005 and realized a profit. . . from the sale," but it "failed to pay the Eddy notes"—which tended to show that by 2005 Collazo no longer had any intention of paying the outstanding Siragusa notes. *Id.* Further, Collazo knew that the thirty-to-sixty-day statement was false because he had "calculated and discussed with Dr. Siragusa the 'price point' at which the sale of a condo would generate profit and a return to Dr. Siragusa," which he could not have done "without understanding how much would be owed to the mortgage lenders at closing," and that nothing would be left for the Siragusas. *Id.* Finally, the bankruptcy court found that Collazo made the thirty-to-sixty-day misrepresentation with the "intent to deceive," as shown by the evidence that he "participated in a series of transactions that rendered the borrower-LLCs incapable of repaying the Chicago loans," a fact of which he "failed to inform the Siragusas . . . before they made the Arizona loan." *Id.* at *11.

Critically, the bankruptcy court also explained that Collazo procured Dana and Robert Joseph's $200,000 loan to his business entity CG Development, LLC, to help finance the Arizona development—but it was not CG Development, LLC, but another Collazo entity, Meridian Corners LLC, that actually purchased the Arizona property. *Id*. at *5. Meridian Corners LLC, like all the other non-borrower entities to which he had transferred unsold condo units, owed no legal obligation to the Siragusas.

The Court disagrees with Collazo that these 2014 findings are inconsistent with the present proposed award of punitive damages. The upshot of these facts is that, by the time of the Arizona loans, Collazo must have recognized the risk to the Siragusas that was inherent in the investment

he was seeking from them. He was asking them to invest money in his business ventures in return for a note that was essentially unenforceable and worthless because the issuing entity had no assets and was judgment-proof. What's more, Collazo's own past dealings with the Siragusas showed precisely how risky this was: they had borrowed from him before, he had failed to repay them, he knew he could not and would not repay them, and when they realized it, they would have no recourse in a breach of contract action because the borrowing entity was judgment-proof. Dana and Dr. Siragusa testified that they would not have invested if they knew of Collazo's practice of transferring assets out of borrowing entities and into entities owing no obligations to the Siragusas, 2014 WL 866075 at *5; indeed, it is hard to imagine any reasonable real-estate investor lending under such risky conditions. Still, Collazo induced the Siragusas to lend him money by way of "'false representations'" that were "'wantonly and designedly made,'" *Jannotta*, 125 F.3d at 511 (quoting *Schneider*, 483 N.E.2d at 1228), because they were "designed to enrich him[,] without regard," *Janotta*, 125 F.3d at 511, for this "highly unreasonable risk of harm" to the Siragusas, *see Loitz*, 563 N.E.2d at 402, *i.e.*, the risk inherent in lending to a company without assets with which to generate funds to repay the loans. The evidence shows that Collazo acted with a sufficient level of culpability to support an award of punitive damages under Illinois law, and the Court agrees with the bankruptcy court's conclusion that punitive damages are appropriate.

Particularly useful in illustrating why the bankruptcy court's conclusion was correct is *Janotta*, in which the Seventh Circuit reached a similar conclusion under similar circumstances. There, the defendants had a business practice of using leasing companies to enter into agreements with commercial property owners to lease sites for their franchisees to operate their Subway restaurants. The defendants promised the landlords that the leasing companies would pay rent for any franchisee who failed to do so and that they would not permit any other franchisees to operate

restaurants within a restricted trade area surrounding the premises. However, they did not disclose to the landlords that the leasing companies had no assets with which to satisfy any judgments entered against them if they did not keep these promises. *Jannotta*, 125 F.3d at 505-510. The Seventh Circuit found "the evidence . . . more than sufficient to establish 'gross fraud,'" *id.* at 511 (quoting *AMPAT/Midwest*, 896 F.2d at 1043), because, in negotiating the lease with the plaintiff-landlord, the defendants falsely represented that the leasing company was a company with substantial assets and employees, and they "[n]ever disclosed to [the plaintiff] that [the leasing company] was merely a shell corporation with no employees and virtually no assets." *Id.* at 512. When the leasing companies did not honor their promises, then, the landlords had no effective legal recourse. Under these circumstances, the Seventh Circuit concluded, "a reasonable jury easily could have found that the defendants 'wantonly and designedly' made a series of utterly false representations in order to induce [the plaintiff-landlord] to execute the instant lease . . . [and] that defendants made these false representations and concealed the true facts in order to enrich themselves at [the plaintiff's] expense." *Id.* at 512 (quoting *Schneider*, 483 N.E.2d at 1228).

This case is similar. Collazo made false representations and concealed his practice of soliciting investments in business entities that lacked assets to satisfy judgments in order to induce the Siragusas to help finance his Arizona development project. That is, like the defendants in *Janotta*, he "wantonly and designedly" made false representations in hopes of enriching himself while exposing the victims of his fraud to a "highly unreasonable risk of harm," *Loitz*, 563 N.E.2d at 402. Under these circumstances, punitive damages are appropriate.

## 2. Whether $100,000 is an excessive punitive damages award

"The Due Process Clause of the Fourteenth Amendment prohibits a State from imposing a 'grossly excessive' punishment on a tortfeasor." *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 562 (1996) (quoting *TXO Production Corp. v. Alliance Resources Corp.*, 509 U.S. 443, 454 (1993)).

"Punitive damages may properly be imposed to further a State's legitimate interests in punishing unlawful conduct and deterring its repetition," but the amount imposed must "be reasonably necessary to vindicate the State's legitimate interests in punishment and deterrence"; if an "award can be fairly categorized as 'grossly excessive' in relation to those interests . . . it enter[s] the zone of arbitrariness that violates" due process. *BMW*, 517 U.S. at 568 (quoting *TXO*, 509 U.S. at 456).

To determine whether punitive damages are excessive, courts are to consider "three guideposts . . . : '(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases.'" *Int'l Union of Operating Engineers, Local 150 v. Lowe Excavating Co.*, 870 N.E.2d 303, 313 (Ill. 2006) (quoting *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003)). In assessing the reprehensibility of the defendant's misconduct, courts are to consider "(1) whether the harm caused was physical as opposed to economic; (2) whether the tortious conduct evinced an indifference to or a reckless disregard for the health and safety of others; (3) whether the target of the conduct was financially vulnerable; (4) whether the conduct involved repeated actions or was an isolated incident; and (5) whether the harm was the result of intentional malice, trickery, or deceit, or mere accident." *Lowe Excavating Co.*, N.E.2d at 313 (citing *State Farm*, 538 U.S. at 419).

Collazo argues that (1) none of the reprehensibility factors was met except the fifth, and that one only because the harm was the result of deceit; (2) a punitive award of $100,000 is excessive in relation to a compensatory award of $200,000 plus interest, which represents full compensation for the loss of the investment; and (3) "Illinois law does not impose a civil penalty

for a common law fraud action," so the third guidepost is "of minimal or no value" (Def.'s Rule 9033 Objections at 14).

The Court disagrees.  First, while it is true that only the fifth reprehensibility factor is met in this case, it is met not merely because Collazo acted with "deceit" but also because he committed gross fraud and acted with malice, as the Court has explained above.  *See Janotta*, 125 F.3d at 511-12, *Roboserve*, 78 F.3d at 275-76.  For all the reasons the Court has already discussed, Collazo's conduct was sufficiently reprehensible to support an award of punitive damages.  *See Lowe Excavating*, 870 N.E.2d at 320-21, 324 (finding that punitive damages were appropriate in an amount equal to more than ten times compensatory damages even though the "overall finding of reprehensibility rests mostly on only one of the five factors").

Second, the punitive damages award is not out of proportion to the amount of actual harm suffered by the Siragusas.  The Siragusas lost an investment of $200,000, twice the proposed punitive damages award of $100,000.  Although there is no bright-line test, punitive damages typically do not offend due process until they "exceed a single-digit ratio between punitive and compensatory damages," or at least a ratio of 4-to-1; sanctions of "double, treble, or quadruple damages to deter and punish" are long established in the law.  *State Farm*, 538 U.S. at 424-25; *see also Lowe Excavating*, 870 N.E.2d at 321 (relying on *State Farm* to reduce punitive damages to a low double-digit ratio).  Here, the bankruptcy court has proposed punitive damages of *less* than the compensatory damages awarded, which does not begin to approach the limits of due process.

Further, the $100,000 award is particularly appropriate because, in this long-running litigation, the Siragusas have expended some $250,000 in attorneys' fees, an amount that exceeds their compensatory damages (apart from the interest).  While Illinois courts may not award attorneys' fees outright as punitive damages, they may take account of the amount of attorneys'

fees expended in determining how to "achieve the goals of punishment and deterrence." *Lowe Excavating*, 870 N.E.2d at 324; *see also Mathias v. Accor Econ. Lodging, Inc.*, 347 F.3d 672, 676-77 (7th Cir. 2003) *cited in Lowe Excavating*, 870 N.E.2d at 324 (explaining that a "function of punitive-damages awards" is to deter and punish misconduct where, for example, compensatory damages alone would be "too slight to give the victim an incentive to sue"). The bankruptcy court did not propose to award punitive damages to offset the entire $250,000, recognizing that much of that sum was likely spent litigating issues unrelated to Dana and Robert Joseph's $200,000 fraud claim, but it judged that a punitive-damages award of $100,000 was appropriate under the circumstances to serve the "goals of punishment and deterrence." (Proposed Findings of Facts and Conclusions of Law at 11-12). This Court agrees.

Third, Collazo is correct that the Illinois legislature has not imposed a civil penalty for a common law fraud action. Because "[t]he purpose of this guidepost is to 'accord substantial deference to legislative judgments concerning appropriate sanctions for the conduct at issue,'" *Lowe Excavating*, 870 N.E.2d at 323-24 (quoting *BMW*, 517 U.S. at 583), this guidepost is therefore inapplicable. *See Gehrett v. Chrysler Corp.*, 882 N.E.2d 1102, 1122 (Ill. App. Ct. 2008) (reaching same conclusion in fraud case).

In summary, while Collazo's conduct may have been of "unremarkable reprehensibility," it was sufficiently reprehensible to support a modest award of punitive damages. *See Campbell v. State Farm Mut. Auto. Ins. Co.*, 98 P.3d 409, 418 (Utah 2004) *on remand from State Farm*, 538 U.S. at 418-19. An award of $100,000, which is half of the amount of compensatory damages, less interest, is very modest and well within the limits of due process. *See Campbell*, 98 P.3d at 418 (explaining that, in a case of "conduct of unremarkable reprehensibility" coupled with "a sizeable compensatory damages award," a "1-to-1 ratio between compensatory and punitive

damages" may be appropriate) *cited in Leyshon v. Diehl Controls N. Am., Inc.*, 946 N.E.2d 864, 884 (Ill. App. Ct. 2010). Given Collazo's gross fraud, designed to enrich him without regard for its effect on others, and given the $250,000 the Siragusas owe or have paid in attorneys' fees in this case, some significant portion of which must correspond to Dana and Robert Joseph's claim, the Court agrees with the bankruptcy court that the facts of this case warrant an award of $100,000 in punitive damages. Thus, this Court agrees with and adopts the bankruptcy court's proposed findings of fact and conclusions of law on punitive damages.

## II. THE SIRAGUSAS' OBJECTIONS

### A. Calculation of Damages

The bankruptcy court concluded that the proper measure of damages in this case was the amount of the lost investment ($200,000), plus simple interest of 5% per annum under 815 ILCS 205/2. According to the Siragusas, the proper measure of damages was the "benefit of the bargain" that Collazo fraudulently induced them to strike. The Siragusas argue that, under the benefit of the bargain theory, they are entitled not only to the return of the $200,000 but also to interest as set forth in the terms of the note. That would be 20% up to the date of maturity and 25% after default, not the 5% statutory rate that the bankruptcy court proposed.

The Siragusas do not cite cases in which courts have used a similar measure of damages under similar circumstances, and this Court agrees with the bankruptcy court that a more appropriate measure of damages here is the amount lent, plus interest, rather than the amount due under the terms of the note. The Illinois Supreme Court long ago held, as the Illinois Appellate Court has more recently explained, that "the measure of damages for a fraudulently induced loan was the sum of money lent plus interest for the time that plaintiff was deprived of possession." *See Commercial Nat. Bank of Peoria v. Fed. Deposit Ins. Corp.*, 476 N.E.2d 809, 815 (Ill. App.

Ct. 1985) (citing *Horne v. Walton*, 7 N.E. 100, 101 (Ill. 1886)).  The Siragusas have provided no reason to depart from these decisions, and the Court sees none.

"Generally, the measure of damages for fraud is such an amount as will compensate the plaintiff for the loss occasioned by the fraud, or the amount which plaintiff is actually out of pocket by reason of the transaction."  *Brown v. Broadway Perryville Lumber Co.*, 508 N.E.2d 1170, 1176 (Ill. App. Ct. 1987) (citing *Martin v. Allstate Ins. Co.*, 416 N.E.2d 347, 352 (Ill. App. Ct. 1981)). It may be true, as the Illinois Appellate Court has explained, that in certain contexts "[d]ecisions in Illinois have generally followed the benefit-of-the-bargain approach," *see Giammanco v. Giammanco*, 625 N.E.2d 990, 998 (Ill. App. Ct. 1993), but that approach is "based on the theory that a defrauded party is entitled to the benefit of his bargain in a transaction and should be placed in the same position that he would have occupied had the false representations on which he acted been true." *Mulligan v. QVC, Inc.*, 888 N.E.2d 1190, 1196-97 (Ill. App. Ct. 2008).  Thus, for example, in the "common fraud scenario where a buyer . . . has been misled about the quality of property, . . . the measure of damages is the difference between the value of the property as it is and what it would have been worth if the representations had been true." *Giammanco*, 625 N.E.2d at 998 (internal quotation marks omitted); *see, e.g., Kinsey v. Scott*, 463 N.E.2d 1359, 1367-68 (Ill. App. Ct. 1984) (where defendant represented that building plaintiff purchased consisted of five apartments instead of four, plaintiff was entitled under benefit-of-the-bargain theory to damages in the amount of the income a fifth apartment would have generated).

But the Illinois Appellate Court has also recognized that "a benefit-of-the-bargain measure may not be appropriate in all circumstances," *Giammanco*, 625 N.E.2d at 998, and the Court fails to see how a benefit-of-the-bargain theory maps onto this case.  If Collazo had not misrepresented when or whether he would be able to repay the notes that were still outstanding in the fall of 2005,

then the Siragusas would not have invested in the Arizona development—but it would not have made the Arizona development any more likely to succeed or Collazo more likely able to repay the Arizona loan at the high rates of interest set forth in the terms of the note.  No doubt the Siragusas expected to be repaid, but Collazo could not have timely paid even if he had wanted to because the Arizona development failed. "Common law fraud claims involving investments do not extend liability based on 'the expected fruits of an unrealized speculation.'"  *Physicians Mut. Ins. Co. v. Asset Allocation & Mgmt. Co., LLC*, No. CIV.A. 06 C 5124, 2007 WL 2875237, at *6 (N.D. Ill. Sept. 28, 2007) (quoting *Smith v. Bolles*, 132 U.S. 125, 129-30 (1889)); *see Schwitters v. Springer*, 86 N.E. 102, 103 (Ill. 1908)) *cited in Physicians Mut. Ins. Co.*, 2007 WL 2875237, at *6; *Lee v. Heights Bank*, 446 N.E.2d 248, 256 (Ill. App. Ct. 1983) (affirming trial court's limitation of fraud damages to the plaintiff's "out-of-pocket loss" because "[g]eneral damages in excess of that amount were . . . based on speculation and conjecture"); Restatement (Second) of Torts § 549 cmt. g. (1977) (benefit-of-the-bargain theory not available to the extent the "harm to the plaintiff becomes mere speculation").  Collazo is liable to the Siragusas to the extent of their investment with interest because he fraudulently induced them to make it, but it would go too far to require him to pay everything due on the note.

Reinforcing the Court's conclusion that the Siragusas' out-of-pocket loss is the proper measure of damages in this case is the fact that, as the bankruptcy court has explained and the Seventh Circuit reiterated, the Siragusas and Collazo were not in contractual privity; the Siragusas lent the $200,000 not to Collazo himself but to CG Development, LLC, a business entity operated by Collazo and Goldman, in exchange for a note from the same entity.  *Collazo*, 2014 WL 866075, at *5-6, *id.* at *7 ("It is true that the Siragusas cannot assert Collazo's liability on the basis of the contractual obligation of the borrower-LLCs without proving the necessity for piercing the LLC

veil[, but they can assert] common law fraud claims based on specific representations made by Collazo[, which] do not relate to the obligations of the borrower-LLCs."); *see Collazo*, 817 F.3d at 1051-52. (*See also* Proposed Findings of Facts and Conclusions of Law at 5-6 (citing these decisions).) "Because of [the] basis of 'benefit of the bargain' damages in contract theory, it would be unfair for a plaintiff to collect 'benefit of the bargain' damages from a defendant that was not a party to the bargain." *Wafra Leasing Corp. 1999-A-1 v. Prime Capital Corp.*, 339 F. Supp. 2d 1051, 1056 (N.D. Ill. 2004); *see* Restatement (Second) of Torts § 549 cmt. a (1977) (stating that "when the financial position of a third person is misrepresented for the purpose of inducing the recipient to extend credit to him," the "loss recoverable" is not "the benefit of [the recipient's] contract" but general damages in "the amount of the credit extended" and never repaid), *id.* at cmt. g (stating that "additional damages sufficient to give [the plaintiff] the benefit of his contract," apart from the amount he is out of pocket, are not available "[w]hen the plaintiff has not entered into any transaction with the defendant but has suffered his pecuniary loss through reliance upon the misrepresentation in dealing with a third person").

The Siragusas do not make any serious objection to the bankruptcy court's use of the 5% statutory interest rate set forth in 815 ILCS 205/2, and the Court agrees that it is supported by sound authority. *See Sheth v. SAB Tool Supply Co.*, 990 N.E.2d 738, 760 (Ill. App. Ct. 2013); *Obermaier v. Obermaier*, 470 N.E.2d 1047, 1054 (Ill. App. Ct. 1984). The Siragusas briefly suggest that they are entitled to a hearing to determine what interest they could have earned from an "alternative use" of the money, but the Siragusas have not even vaguely suggested what alternative investment they might have made that would have earned more than the statutory 5% rate, nor do they cite any authority for setting any such hearing apart from this Court's 2015 opinion. Although it is true that this Court previously mentioned "alternative use" damages, *see*

*Fed. Deposit Ins. Corp. v. W.R. Grace & Co.*, 877 F.2d 614, 623 (7th Cir. 1989), it did so only by way of explaining that the Siragusas had not satisfactorily demonstrated that their proposed measure of damages was the correct approach among potential alternatives. The bankruptcy court, having solicited the parties' input on the matter, has considered the matter fully and chosen the statutory 5% rate among those alternatives, and the Siragusas' argument for a different measure of interest is perfunctory at best, and therefore waived. *See Doe ex rel. G.S. v. Johnson*, 52 F.3d 1448, 1457 (7th Cir. 1995) ("We have made it clear that a litigant who fails to press a point by supporting it with pertinent authority, or by showing why it is sound despite a lack of supporting authority, forfeits the point.") (internal quotation marks omitted); *Tyler v. Runyon*, 70 F.3d 458, 464 (7th Cir. 1995) (The court "has no duty to research and construct legal arguments available to a party, especially when he is represented by counsel.") (internal quotation marks omitted). In any case, the Court agrees with the bankruptcy court that the 5% statutory rate is appropriate here.

**B.  Attorney's Fees**

The bankruptcy court concluded that the Siragusas are not entitled to an award of their attorneys' fees outright because, absent an agreement or statute to the contrary, attorneys' fees can only be recovered as damages for fraud when the fraud embroiled the plaintiff in litigation with third parties or raised other legal obstacles for him to deal with, not merely because the plaintiff was required to file a lawsuit to redress the defendant's wrongdoing. (Proposed Findings of Fact and Conclusions of Law at 12 (citing *Tolve v. Ogden Chrysler Plymouth*, 744 N.E.2d 536, 541 (Ill. App. Ct. 2001) and *Ritter v. Ritter*, 46 N.E.2d 41, 44 (Ill. 1943).) The bankruptcy court's conclusion is supported by sound authority, and the Court agrees with it.

The Siragusas object, citing *Eljer Manufacturing, Inc. v. Kowin Development Corp.*, 14 F.3d 1250, 1257 (7th Cir. 1994), *Tan v. Boyke*, 508 N.E.2d 390, 392-93 (Ill. App. Ct. 1987), and

*Father & Sons, Inc. v. Taylor*, 703 N.E.2d 532, 537 (Ill. App. Ct. 1998). Upon inspection, none of these cases genuinely supports the Siragusas' position.

In *Eljer*, the Seventh Circuit stated that "Illinois law permits the recovery of attorneys' fees as damages *if the plaintiff proves that the fees resulted from the defendant's misconduct* and the fees are reasonable." 14 F.3d at 1257 (emphasis added). It cited two cases, *Tan v. Boyke*, 508 N.E.2d at 397 and *Calcagno v. Personalcare Health Mgmt., Inc.*, 565 N.E.2d 1330, 1339 (Ill. App. Ct. 1991), but both appear to have involved not attorneys' fees incurred in litigating the fraud action between the parties but attorneys' fees as damages to compensate for other legal expenditures occasioned by the defendant's fraud, apart from the fraud action.

In *Tan*, the plaintiff claimed that the defendant fraudulently induced him to sign a contract to purchase two apartment buildings that did not conform to the applicable building permits, as his attorney discovered in doing due diligence ahead of the sale. 565 N.E.2d at 392-93. The plaintiff apparently sought attorneys' fees incurred during that due diligence process, not attorneys' fees incurred in the fraud action he brought against the defendant. *See id.* at 392-93, *id.* at 397 (citing *Omni Overseas Freighting Co. v. Cardell Ins. Agency*, 397 N.E.2d 112, 113-14, 117 (Ill. App. Ct. 1979) (in action for failure to procure insurance coverage, awarding as damages attorneys' fees plaintiff incurred defending itself in separate lawsuits it expected its insurer to defend)). In *Calcagno*, the court specifically stated that attorneys' fees "may be recovered under the common law as an element of compensatory damages to the extent the defendant's tortious conduct proximately caused the plaintiff to incur them *and they were not incurred in the same litigation in which they are recovered*." 565 N.E.2d at 1339 (emphasis added).

In *Father & Sons*, the plaintiffs asserted both common law fraud and statutory consumer fraud claims under the Illinois Consumer Fraud and Deceptive Business Practices Act ("Consumer

Fraud Act"), and the court recognized that the Consumer Fraud Act "specifically provides for attorney fees to a prevailing party alleging fraudulent and deceptive practices." 703 N.E.2d at 537 (citing 815 ILCS 505/10a(a)). Without elaborating, the court stated that, "[i]n addition, actions at common law fraud provide for the award of attorney fees and costs," citing *Black v. Iovino*, 580 N.E.2d 139, 149-51 (Ill. App. Ct. 1991), and then went on to cite the standard for awarding fees under the Consumer Fraud Act, without returning to the matter of whether an award of attorneys' fees is proper under Illinois common law. 703 N.E.2d at 537. In *Black v. Iovino*, like *Father & Sons*, the plaintiff prevailed on both common law fraud *and* Illinois Consumer Fraud Act claims, and the Court did not distinguish between them for purposes of the award of attorneys' fees, nor did it suggest that a common-law fraud plaintiff may recover attorneys' fees if he does not also assert a Consumer Fraud Act claim. *Black*, 580 N.E.2d at 144-45, 149, 150-51.

Thus, these cases provide little or no support for the position that a plaintiff who prevails in an Illinois common law fraud action may be awarded attorneys' fees incurred in litigating that action. None even arguably supports the position that courts *must* award attorneys' fees in such circumstances, nor has the Court found any authority for any such position. Rather, the case law shows that "[i]n the absence of any applicable statute, . . . there is no basis for the allowance of attorneys['] fees and costs" to a prevailing fraud plaintiff "in addition to the sum assessed as damages," although fees may be considered in determining the amount of punitive damages to award. *See Russow v. Bobola*, 277 N.E.2d 769, 773 (Ill. App. Ct. 1972). This Court agrees with the bankruptcy court that awarding the Siragusas their attorneys' fees in this action is not appropriate, but the Court has taken those fees into account in assessing punitive damages.

## <u>CONCLUSION</u>

For the reasons set forth above, the Court adopts the bankruptcy court's proposed findings of fact and conclusions of law. Judgment will be entered against Arturo Collazo and in favor of Robert Joseph in an amount equal to $150,000 plus 5% *per annum* simple interest on $150,000, with that interest to run from November 22, 2005, to the date that judgment is entered, and with punitive damages of $75,000 added to that total amount. Judgment will also be entered against Arturo Collazo and in favor of Dana Siragusa in an amount equal to $50,000 plus 5% *per annum* simple interest on $50,000, with that interest to run from November 22, 2005, to the date that judgment is entered, and with punitive damages of $25,000 added to that total amount. By February 27, 2020, Dana and Robert Joseph Siragusa are directed to calculate the final dollar amount including interest accrued as of that date and submit a proposed judgment order to the Court's proposed order email inbox, Proposed_Order_Alonso@ilnd.uscourts.gov.

**SO ORDERED.**

**ENTERED: February 20, 2020**

**HON. JORGE L. ALONSO**
**United States District Judge**